UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOUNG YOON S.,<br>   Plaintiff,<br><br> v.<br><br>KILOLO KIJAKAZI,<br>   Defendant. | Case No. 19-cv-03711-DMR<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 23, 27 |

Plaintiff Moung Yoon S. moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found Plaintiff not disabled and therefore denied her application for benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq*. The Commissioner cross-moves to affirm. For the reasons stated below, the court grants both motions in part and denies them in part.

**I. PROCEDURAL HISTORY**

Plaintiff filed an application for Social Security Disability Insurance ("SSDI") benefits on December 17, 2015, alleging disability beginning on January 15, 2015. Administrative Record ("A.R.") 173, 183. The application was initially denied on July 22, 2016 and again on reconsideration on October 12, 2016. An Administrative Law Judge ("ALJ") held a hearing on November 30, 2017 and issued an unfavorable decision on August 22, 2018. The ALJ determined that Plaintiff has the severe impairment of arthritis of the joints and found that Plaintiff retains the following residual functional capacity ("RFC"):

> [C]laimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she can frequently respond appropriately to supervisors, coworkers, and the public. The claimant can use a cane or crutches for ambulation as needed.

A.R. 20-21.

1    The ALJ determined that Plaintiff's work history, testimony and income records support a
finding that she performed past relevant work as a data entry clerk. A.R. 23. The ALJ relied on
the opinion of a vocational expert ("VE"), who testified that Plaintiff is able to work as a data
entry clerk, both as actually performed and as generally performed in the national economy. The
ALJ thus concluded that Plaintiff is capable of performing her past relevant work and is not
disabled. A.R. 23-24.

After the Appeals Council denied review, Plaintiff sought review in this court pursuant to
42 U.S.C. § 405(g).

## II. ISSUES FOR REVIEW

Plaintiff raises four issues in her challenge to the ALJ's decision:

1. Whether the ALJ's decision that Plaintiff's medically determinable mental impairments are not severe is supported by substantial evidence;
2. Whether the ALJ erred by failing to make necessary findings regarding the physical and mental demands of the claimant's past relevant work pursuant to SSR 82-62;
3. Whether the ALJ erred in finding Plaintiff not credible; and
4. Whether the ALJ erred in rejecting the lay testimony of Meuy Saechao.

Pl.'s Br. [Docket No. 23-1] at 13.

The Commissioner cross-moves to affirm, arguing that the ALJ's decision is supported by substantial evidence and is free of legal error.

## III. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

2

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

**IV.   DISCUSSION**

**A.   The ALJ's Finding that Plaintiff's Medically Determinable Mental Impairments are Nonsevere**

The ALJ determined that Plaintiff has the severe impairment of arthritis of the joint, but that her "medically determinable mental impairments of major depressive disorder, generalized anxiety behavior, and PTSD, considered singly and in combination, do not cause more than minimal limitation on her ability to perform basic mental work activities and are therefore nonsevere." A.R. 18.

In so finding, the ALJ considered four areas of mental functioning pursuant to 20 C.F.R. § 404.1520a. He found a mild limitation in one area and no limitation in the other three. Specifically, the ALJ found no limitation in the functional area of understanding, remembering, or applying information. Focusing on Plaintiff's allegations of memory loss, the ALJ cited generally to record 2F in holding that Plaintiff had intact memory and judgment in multiple examinations, and that there was little evidence suggesting that she needed assistance with remembering her medical appointments or understanding her treatment plan. A.R. 18.

The ALJ cited generally to records 2F, 7F, 8F and 10F to support that Plaintiff has no limitation in the area of interacting with others, although he confusingly ended his analysis by finding that Plaintiff has "up to moderate limitations interacting with others." A.R. 18. The ALJ justified this by stating that the cited records do not show that Plaintiff has problems interacting

3

with medical staff, and medical evaluators describe her as pleasant and cooperative. *Id.*

The ALJ found a mild limitation in the third functional area of concentrating, persisting, or maintaining pace. The ALJ determined that Plaintiff's mental status exams show that she has the ability to engage in abstract thinking, calculations, and logical thought, again generally citing to records 2F, 7F, 8F and 10F.

In the fourth area of adapting or managing oneself, the ALJ found no limitation. A.R. 18-19. Although Plaintiff explained that she has difficulty performing certain personal hygiene care, the ALJ determined that records 2F, 7F and 10F show that she can use the bathroom, feed, and groom herself. The ALJ also noted an absence of evidence that Plaintiff is significantly limited in her ability to be aware of potential hazards, or that she needs excessive supervision while performing basic tasks.

### 1.  Legal Standard

At step two of the five-step sequential evaluation for disability claims, the ALJ must determine whether the claimant has one or more severe impairments that significantly limit a claimant's ability to perform basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii) and (c); 416.920(a)(4)(ii) and (c). "Basic work activities are abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (quotation omitted). The Ninth Circuit has held that "the step-two inquiry is a de minimis screening device to dispose of groundless claims." *Id.* (citation omitted). "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual[']s ability to work." *Id.* (quotations omitted). A severe impairment "must be established by objective medical evidence from an acceptable medical source," 20 C.F.R. § 416.921, and the ALJ must "consider the claimant's subjective symptoms, such as pain or fatigue, in determining severity." *Smolen*, 80 F.3d at 1290 (citations omitted).

### 2.  Analysis

The court concludes that the ALJ's determination that Plaintiff's medically determinable mental impairments are nonsevere is not supported by substantial evidence. The ALJ's decision is

4

frankly inexplicable in light of the fact that every non-examining, examining, and treating medical professional found that Plaintiff's mental disorders would likely have more than a minimal effect on her ability to work. The only individual to conclude otherwise is the ALJ. Plaintiff's long-term providers diagnosed Plaintiff with major depressive disorder, generalized anxiety disorder, and PTSD. Her treatment plan includes therapeutic and psychiatric care, along with numerous psychiatric medications. The records indicate that she has been fully compliant with all modes of treatment but still suffers from significant symptoms including frequent panic attacks accompanied by diarrhea.

Starting with the opinions of non-treating providers, two state agency doctors reviewed Plaintiff's records in order to perform a psychiatric review. Both found that her mental impairments are severe. A.R. 80, 96. Dr. Genece and Dr. Lewy both determined that Plaintiff has mild restrictions in her activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. *Id.* Dr. Genece found limitations in all four areas of functioning. These findings include that Plaintiff is moderately limited in her ability to understand and remember detailed instructions, her ability to carry out detailed instructions and to maintain attention and concentration for extended periods, and her ability to complete a normal workday without interruptions from psychologically based symptoms. A.R. 84. Dr. Genece also found moderate limitations in Plaintiff's ability to interact with the general public. *Id.* Dr. Genece's review of the record also led to a finding of moderate limitations in her ability to respond appropriately to changes in the work setting. A.R. 85. Dr. Lewy found moderate limitations in three of the four areas of functioning. A.R. 100-101.

On June 17, 2016, Plaintiff underwent a mental status assessment with Paul Martin, Ph.D. at the request of the Department of Social Services. A.R. 594-601. Dr. Martin remarked that Plaintiff was an adequate historian "and presented her psychiatric symptoms in a clear and what appeared to be genuine report of her personal experiences." Dr. Martin observed that on several tests, Plaintiff gave answers that "would typically be seen in an individual feigning cognitive abilities." Dr. Martin went on to note that "[d]espite this unexpected performance [on] a mental status exam, her psychiatric history as described above appears to be accurate, although additional

5

records from her treating physician and mental health providers would be useful." Dr. Martin diagnosed her with major depressive order, chronic PTSD, R/O malingering, and pain disorder. On Axis V, he assessed her GAF at 52.[1] Dr. Martin opined that Plaintiff has a number of work-related limitations, including a marked limitation in the ability to complete a normal workweek without interruptions resulting from her psychiatric condition. He found that Plaintiff has moderate limitations in her ability to perform work on a consistent basis, and to deal with the usual stresses of competitive work. He also found mild limitations in Plaintiff's ability to work without special supervision, to maintain regular attendance, to perform detailed and complex tasks, and to interact with coworkers and the public. *Id.*

The records of her longtime treating providers amply demonstrate that Plaintiff's mental impairments more than meet the threshold step two question of severity. Plaintiff first sought treatment for mental health issues in 2012. She was treated in the emergency room on May 5, 2012 for an anxiety attack. A.R. 442-446. She returned several days in a row for the same symptoms. *See* A.R. 475 (5/23/12) ("pt has been seen here for the past 3 days for the same symptoms.") On her follow-up visit on May 24, 2012, the attending physician noted that Plaintiff had "what sounds like lifelong or at least long-standing general anxiety and GERD [and] now having flushing and diarrhea in attacks." A.R. 467. On July 23, 2012, Dr. Robert Goldfien, Plaintiff's longtime treating rheumatologist, treated her for swelling in her legs and anxiety. He noted "[i]n addition she is having continued concerns about panic attacks – gets flushed and anxious easily…She's continued to use lorazepam often twice a day, and she is also taking Celexa. It's not clear that these are helpful very much however." A.R. 499. Dr. Goldfien replaced propranolol with atenolol, and "arranged for a visit … to get help with the anxiety." A.R. 501.

---

[1] "[T]he Global Assessment of Functioning ("GAF") Scale . . . attempts to quantify a patient's ability to function in daily life" on a scale from 0 to 100. Higher scores correspond with higher ability to function. *Cantu v. Colvin*, No. 5:13-cv-01621-RMW, 2015 WL 1062101, at *6 (N.D. Cal. Mar. 10, 2015); *see also* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 27-34 (4th ed. 2000) ("DSM–IV"). The DSM-IV been replaced by the DSM-5, which eliminated the multiaxial system of diagnosis. A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers, or co-workers)." DSM-IV, at 34.

On September 4, 2012, Dr. Weinstein diagnosed her with an anxiety disorder and prescribed Celexa, Ativan, and Propranol. A.R. 301-305.

Plaintiff began individual therapy with Joanna Manqueros, LCSW on August 5, 2015. At her initial visit, she explained that she and her family fled Laos when she was an adolescent and ended up in a refugee camp in Thailand. Plaintiff explained that during that time she suffered severe trauma, having repeatedly witnessed hunger, terrible violence, and death. She explained that she had been suffering from depression and anxiety for several years. She presented as tearful, anxious and distractible. She complained of anxiety, excessive worry, hypervigilance, anhedonia, insomnia, decreased energy and decreased concentration, among other things. Ms. Manqueros diagnosed Plaintiff with PTSD and assessed Plaintiff's Axis V status at "41-50 serious symptoms." A.R. 307-312; *see also* A.R. 324 (9/4/15) A.R. 350 (12/28/15) A.R. 411 (1/8/16). At other times, Manqueros assessed her Axis V status slightly higher at "51-60 moderate symptoms." *See, e.g.,* A.R. 328 (9/18/15); A.R. 332 (10/5/15); A.R. 344 (12/11/15). Plaintiff received treatment from Ms. Manqueros for at least two years, through the end date of available records. Throughout her treatment, Plaintiff repeatedly displayed signs of distress and complained of anxiety, loss of concentration, and frequent panic attacks, which continued despite medication and participation in therapeutic classes. *See e.g.,* A.R. 324 (9/4/15); A.R. 332 (10/5/15: problems focusing, disabling anxiety and depression, insomnia, intrusive memories of trauma); A.R. 324 (9/14/15: displayed tearfulness, psychomotor retardation, disorganized thought processes, distractible attention, and dysphoric mood; a euthymic, depressed and anxious mood); A.R. 411 (1/8/16: depressed, dysphoric and anxious mood); A.R. 651 (7/19/17: psychomotor retardation); A.R. 643-644 (8/4/17: still experiencing depression, sleep disturbance and panic attacks; exhibiting psychomotor retardation and dysphoric mood).

Plaintiff began seeing psychiatrist Dr. Debra Denherder on August 17, 2015 and was diagnosed with generalized anxiety disorder, panic disorder, chronic PTSD, and major depressive disorder, with an Axis V assessment of "41-51 serious symptoms." In her first visit, she presented as tearful, with a depressed, dysphoric, anxious and irritable mood. She reported a history of frequent anxiety attacks accompanied by diarrhea. She complained of excessive worry, fatigue,

difficulty concentrating, irritability, insomnia, muscle tenseness, crying spells, depressed mood, crying spells, hypervigilance, and distressing dreams, among other things. She explained that she had been taking Celexa and Propranolol, which were helpful but inadequate, and that she had taken Lorazepam in the past, which was helpful. Dr. Denherder increased her Celexa dose, continued Plaintiff on Propranolol, added Lorazepam, and noted Plaintiff's continued participation in individual therapy sessions. A.R. 313-322. Dr. Denherder also treated Plaintiff for at least two years, through the last date of available records. Throughout her treatment, Plaintiff repeatedly complained of panic attacks accompanied by diarrhea, insomnia, and passive suicidality. For example, on September 14, 2016, Dr. Denherder observed Plaintiff's mood to be depressed, dysphoric, anxious and irritable. On that visit, Plaintiff complained of hopelessness, anxiety attacks, inability to sleep, and suicidality, and reported that medications were helpful but inadequate. A.R. 607. *See also* A.R. 713 (12/9/16 visit includes exploration "at length" about risk of self-harm); A.R. 721 (11/7/16: anxiety with diarrhea, thoughts of self-harm, staying inside most of the time, hopelessness); A.R. 706 (1/11/17: still getting diarrhea with panic attacks; plans of self-harm still go through her mind); A.R. 691 (2/10/17 visit included counseling re suicidal ideation). On September 11, 2017, Dr. Denherder again observed Plaintiff's mood to be depressed, dysphoric, anxious and irritable. Plaintiff continued to complain of frequent panic attacks with diarrhea in spite of medication, as well as insomnia, hopelessness, and passive suicidality. A.R. 630-632.

On February 23, 2016, Ms. Manqueros and Dr. Denherder submitted a letter explaining that Plaintiff has major depressive disorder and PTSD. A.R. 586-587. Noting her history of "extensive traumas" as a "witness to war, hunger, terrible violence, and other atrocities," they explained that Plaintiff's PTSD symptoms include "recurrent memories of past traumas, nightmares, sleep disturbance, recurrent thoughts of death, hypervigilance, avoidance and exaggerated startle response." Persistent intrusive thoughts and daily flashbacks "interfere with her ability to function effectively, concentrate and remain focused. She presents with a depressed affect and is often tearful during appointments." They explained that Plaintiff described daily panic attacks, and that "[o]n occasion, her symptoms became so severe at work that her supervisor

called 911 and she was taken to the emergency room." In conclusion, they opined that "[h]er symptoms of anxiety and resulting concentration deficits make working at a reasonable pace difficult. When she becomes anxious, which is often, she cannot focus on what she needs to do. She is easily stressed and susceptible to worsening symptoms when she encounters reminders of traumatic events. Without any doubt, [Plaintiff] is psychiatrically disabled by her severe PTSD symptoms." *Id.*

On August 30, 2017, Ms. Manqueros and Dr. Denherder submitted a second letter in which they noted that Plaintiff continued to struggle with insomnia, severely depressed mood with suicidal ideation, panic episodes, chronic worry, trauma-related nightmares and anhedonia, among other symptoms. They recommended that she be considered not only for disability, but also for In Home Support Services. They noted that she has been in treatment since 2015 and has participated in all recommended treatment and services including psychiatric medication, EMDR, individual and group therapy. Her treaters observed that Plaintiff's condition has not improved, and that she is unable to perform the activities of daily living sufficient to adequately provide for herself. A.R. 627.

On October 23, 2017, Dr. Goldfein submitted a letter documenting his opinions and observations regarding his longtime treatment of Plaintiff for arthritis. He noted that "[a]nother contributing factor to [Plaintiff's] poor functioning is her fragile mental state. She has a longstanding history of significant mental health issues including depression, anxiety with panic attacks, and chronic posttraumatic stress disorder. She participates in regular mental health treatment at our behavioral health clinic." A.R. 748.

The medical records documenting the significant impacts of Plaintiff's mental impairments on her ability to work are corroborated by Plaintiff's daughter, who submitted a Third Party Function Report. In it, she explains that family members have to remind Plaintiff to take her medication because she often forgets. A.R. 220. Plaintiff's husband now handles the household bills and finances because Plaintiff gets extremely nervous and anxious about handling money. A.R. 221-222. Plaintiff has a hard time retaining information because she cannot focus or concentrate and she is anxious all the time. A.R. 223. The family must repeatedly explain things

to Plaintiff and read written instructions out loud to her multiple times. A.R. 223.

In sum, the ALJ's determination that Plaintiff's mental impairments are nonsevere is not supported by substantial evidence. To the contrary, the record overwhelmingly supports that they are severe. If an ALJ does not consider all medically determinable impairments when assessing a claimant's RFC, then an error at step two is not harmless. *See Mercado v. Berryhill*, No. 16-cv-04200-BLF, 2017 WL 4029222, at *6 (N.D. Cal. Sept. 13, 2017). Here, the ALJ gave virtually no consideration to Plaintiff's mental impairments when formulating her RFC. For this reason, the ALJ's error is not harmless. On remand, the ALJ shall revisit the step two analysis and make findings consistent with this order.[2]

### B. The ALJ's Finding that Plaintiff Is Able to Perform Past Relevant Work

The ALJ determined that Plaintiff is able to perform her past relevant work as a "data entry clerk, DOT 203.582-054, a sedentary and semi-skilled job (SVP 4)" and that her residual functional capacity does not "preclude[]" such work. A.R. 23. He gave "great weight" to the testimony of the VE and accordingly found that Plaintiff could perform her past relevant work as "both as actually performed and as generally performed in the nationally economy." *Id.*

Plaintiff contests the ALJ's characterization of her previous job. She contends that he should have classified her as an Administrative Assistant, DOT 169.167-010, a sedentary and skilled job with an SVP of 7, and assessed her capacity according to the duties involved with that job. She also contends that the ALJ failed to inquire or make factual findings as to any limitations that her mental impairments imposed on her work functions.

#### 1. Legal Standard

At the fourth step, the ALJ considers an assessment of the claimant's residual functional

---

[2] The error at step two could impact the ALJ's determination at other steps of the analysis. For this reason, the court does not reach two issues raised by Plaintiff, namely whether the ALJ erred in discounting Plaintiff's credibility and rejecting the lay testimony of her daughter. In re-analyzing the record at step two, it is possible that the ALJ may determine that Plaintiff and her daughter's testimony is more consistent with the medical evidence than previously considered. Moreover, as discussed below, the error at step two could impact the ALJ's determination on whether Plaintiff can perform her past relevant work. On remand, the ALJ should revisit these issues and make findings consistent with this order and the regulations.

10

1   capacity ("RFC") and the claimant's past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  "At step
2   four, claimants have the burden of showing that they can no longer perform their past relevant
3   work."  *Pinto v. Massanari*, 249 F.3d 840, 844 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520(e),
4   416.920(e)).  If the claimant can still do their past relevant work, the ALJ will find that the
5   claimant is not disabled.  The ALJ must make specific factual findings as to the claimant's
6   "residual functional capacity and the physical and mental demands" of the past relevant work.  *Id.*
7   at 844-45.
8       "A claimant must be able to perform her past relevant work either as actually performed or
9   as generally performed in the national economy."  *Lewis v. Barnhart*, 281 F.3d 1081, 1083 (9th
10  Cir. 2002).  For work as "actually performed," the ALJ may draw on the claimant's own testimony
11  and a vocational expert's report and/or testimony.  *Id.*; 20 C.F.R. § 404.1560(b)(2).  For work as
12  "generally performed," the inquiry turns on whether "the claimant cannot perform the excessive
13  functional demands and/or job duties actually required in the former job but can perform the
14  functional demands and job duties as generally required by employers throughout the economy[.]"
15  *Stacy v. Colvin*, 825 F.3d 563, 569 (9th Cir. 2016) (quoting SSR 82-61, 1982 WL 31387 (1982)).
16  "[T]he best source for how a job is generally performed is usually the Dictionary of Occupational
17  Titles ["DOT"]."  *Pinto*, 249 F.3d at 845.

### 2. Waiver

19  As a threshold matter, the Commissioner argues that Plaintiff waived her argument that she
20  was misclassified as a data entry clerk and not as an administrative assistant because she failed to
21  challenge the issue at the hearing.  Opp'n at 6.  The court disagrees.  Ordinarily, "at least when
22  claimants are represented by counsel, they must raise all issues and evidence at their
23  administrative hearings in order to preserve them on appeal."  *Shaibi v. Berryhill*, 883 F.3d 1102,
24  1109 (9th Cir. 2017) (quoting *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999)).  A Social
25  Security claimant who fails to raise an issue before the ALJ forfeits that argument and cannot raise
26  it for the first time in the district court.  This rule is "in light of the fundamental principle that an
27  agency, its experts, and its administrative law judges are better positioned to weigh conflicting

1  evidence than a reviewing court." *Shaibi*, 883 F.3d at 1109.³ In *Shaibi*, the Ninth Circuit
2  concluded that the appellant waived his argument by failing to challenge the vocational expert's
3  job numbers. *Id.* at 1108-09. In *Meanel*, the Ninth Circuit concluded that the appellant—or her
4  counsel—failed to provide evidence at the hearing to counter the vocational expert's testimony on
5  availability of jobs in the area, thereby forfeiting the argument. *Meanel*, 172 F.3d at 1115.

Plaintiff sufficiently raised the issue of her past relevant work such that the court does not deem the matter waived. She described her job as an administrative assistant on multiple occasions: on her work history report, A. R. 204, 211, in her counsel's pre-hearing brief, A.R. 259, and in her testimony at the hearing, A.R. 35. ("I was administrative assistant, so my main job is to input data, data entry and answer the phone.") The agency also classified her as such on her initial disability determination and on reconsideration. A.R. 86, 102. While Saechao's counsel did not specifically contest the finding on past relevant work in her application to the Appeals Council, she generally appealed all legal issues. A.R. 172.

### 3. Least Demanding Function

On the merits of the past relevant work issue, plaintiff first contends that the ALJ, relying on the VE, impermissibly classified her job according to its "least demanding function." Mot. at 20-21; Reply at 4. As noted, Plaintiff self-identified her past relevant work as an administrative assistant, as did the agency in its initial determination. A. R. 35, 86, 204, 211, 259. At the hearing, however, the VE identified Saechao's work as "data entry/clerical assistant, DOT number 203.582-054, the exertional level is sedentary, and it is semi-skilled at an SVP of 4." A.R. 62. The ALJ found that Plaintiff's "work history, testimony and income records support work as a data entry clerk" and adopted the VE's testimony that Plaintiff could perform this work both as actually performed and as generally performed in the national economy. A.R. 23-24; *see also* A.R. at 63-64 (VE's testimony). The ALJ did not err in making this finding.

---

³ On the other hand, arguments that deal with pure questions of law or the ALJ's affirmative duty to resolve conflicts between the Dictionary of Occupational Titles and vocational expert's conclusions may not be waived. *Maxwell v. Saul*, 917 F.3d 1128, 1130 (9th Cir. 2020) (citing *Silveira v. Apfel*, 204 F.3d 1257, 1260 n.8 (9th Cir. 2000) (per curiam)); *Lamear v. Berryhill*, 865 F.3d 1201, 1206 (9th Cir. 2017).

12

At step four, "the ALJ may not classify a past occupation 'according to the least demanding function.'" *Stacy*, 825 F.3d at 569 (quoting *Carmickle v. Comm'r*, 533 F.3d 1155, 1166 (9th Cir. 2008)). In *Stacy*, the Ninth Circuit addressed a line of cases finding legal error as to the past relevant work inquiry where "'the least demanding aspect' of the claimant's past job was something the claimant did less than half the time, and the ALJ erred in equating that one task with a full time job." *Id.* at 570. The court summarized the cases as follows:

> In *Carmickle* [533 F.3d at 1166], only 20 percent of the claimant's duties as a construction supervisor involved supervision; the remainder of his time was spent performing manual labor. *Id.* We held that the ALJ erred in categorizing the claimant's job as "a purely supervisory position." *Id.* Similarly, in *Valencia* [*v. Heckler*, 751 F.2d 1082, 1086 (9th Cir. 1985)], the ALJ erred in classifying the claimant's prior work as a "tomato sorter" involving only light exertion because the claimant was actually an "agricultural laborer" who mostly performed other, medium exertion tasks. *Valencia*, 751 F.2d at 1086. And, in *Vertigan v. Halter*, the ALJ erred by categorizing the claimant's past work as a "cashier" when she was actually a "pharmacy clerk" and cashier work was only "a small part of her job." 260 F.3d 1044, 1051 (9th Cir. 2001).

*Stacy*, 825 F.3d at 569-70.

The *Stacy* court found those cases distinguishable and held that the ALJ did not err by classifying the plaintiff's past relevant work by the least demanding aspect of the job— supervising. Instead, the court held that he could still perform the job as generally performed. *Id.* at 570. Stacy argued that the ALJ misclassified his job as a Stationary-Engineer Supervisor, which the DOT classified as "purely supervisory." *Id.* The ALJ found that Stacy "spent the vast majority of his time supervising." *Id.* The court ruled that "[t]he fact that his employer also required him to occasionally do other, non-supervisory tasks does not change the fundamental nature of his work," which distinguished his case from the *Carmickle* line of cases, "where the claimants performed less-demanding tasks only occasionally." *Id.* The court held that those cases do not apply "where (1) the 'least demanding function' is a task that the claimant actually performed most of the time; and (2) the DOT defines the claimant's past job as requiring only that least demanding function." *Id*. The court concluded that the ALJ correctly applied the "generally performed" test and did not categorize the plaintiff's past work according to its least demanding function. *Id.*

Other courts applying *Stacy* have found no error where the plaintiff did not provide

13

evidence that she performed other tasks most of the time. *Compare Kyle R. v. Saul*, No. 20-cv-4453, 2021 WL 1374487, at *3 (C.D. Cal. Apr. 12, 2021) (MacKinnon, J.) (ALJ committed no error in classifying plaintiff as a retail manager because he spent the "[w]hole day" supervising others, even if he "may have performed other, non-managerial tasks"), *and Bowman v. Colvin*, 228 F. Supp. 3d 1121, 1139 (D. Or. 2017) (Hernandez, J.) (no error where plaintiff described conducting least demanding functions as a receptionist "the vast majority of the time"), *with Listiak v. Comm'r*, No. 18-1709, 2019 WL 2525403, at *2-3 (D. Ariz. June 19, 2019) (Snow, J.) (error where golf club manager classified as performing sedentary work but ALJ found he performed functions requiring light to medium exertion), *and Speciale v. Berryhill*, No. 16-cv-1659, 2017 WL 1540783, at *4 (N.D. Cal. Apr. 28, 2017) (Freeman, J.) (remanding to resolve evidentiary contradictions as to whether least demanding function comprised 100 percent or 40 percent of plaintiff's position). *See also Ruben A. v. Saul*, No. 19-cv-3893, 2020 WL 1897578, at *9-10 (N.D. Cal. Apr. 16, 2020) (Chen, J.) (finding error under *Carmickle* where ALJ classified concert promoter as a booking manager, a sedentary position, which was "at odds with Ruben A.'s testimony" that his job entailed significant physical exertion).

This court holds that under *Stacy*, the ALJ's findings on Plaintiff's past relevant work are supported by substantial evidence. In Plaintiff's work history report, she described her work at Catholic Charities as "data entry, answered phones, assisted clients, filing, record keeping, made appointments, kept calendars up to data and many other general office duties." A.R. 212. She used machines, tools, or equipment; used technical knowledge or skills, and performed writing or completed reports. *Id.* She mainly sat and wrote/typed/handled small objects. *Id.* She frequently lifted less than ten pounds. *Id.*

Plaintiff's testimony at the hearing described the tasks she performed at her previous job as she actually performed them. She testified that as an administrative assistant, her "main job is to input data, data entry and answer the phone." A.R. 35. She testified that she mostly "s[a]t on the desk" but sometimes "had to get up" to answer the door. *Id.* Aware of Plaintiff's "limitation," her coworker and supervisor helped relieve her from doing any heavy lifting. A.R. 35, 47-48. Plaintiff also spoke on the phone with callers to Catholic Charities, but if the callers grew

14

aggressive (e.g., "they will curse you and things like that"), her "supervisor or [her] coworker would take over because they saw that [she] can't deal with it, [her] anxiety will come and everything." A.R. 48. She reported experiencing frequent panic attacks at work that sometimes caused her supervisor to contact her daughter to pick her up. *Id.* at 45-46.

The DOT defines Administrative Assistant, DOT code 169.167.010, as follows:

> Aids executive in staff capacity by coordinating office services, such as personnel, budget preparation and control, housekeeping, records control, and special management studies: Studies management methods in order to improve workflow, simplify reporting procedures, or implement cost reductions. Analyzes unit operating practices, such as recordkeeping systems, forms control, office layout, suggestion systems, personnel and budgetary requirements, and performance standards to create new systems or revise established procedures. Analyzes jobs to delimit position responsibilities for use in wage and salary adjustments, promotions, and evaluation of workflow. Studies methods of improving work measurements or performance standards. Coordinates collection and preparation of operating reports, such as time-and-attendance records, terminations, new hires, transfers, budget expenditures, and statistical records of performance data. Prepares reports including conclusions and recommendations for solution of administrative problems. Issues and interprets operating policies. Reviews and answers correspondence. May assist in preparation of budget needs and annual reports of organization. May interview job applicants, conduct orientation of new employees, and plan training programs. May direct services, such as maintenance, repair, supplies, mail, and files. May compile, store, and retrieve management data, using computer.[4]

By contrast, the DOT defines data entry clerk, DOT code 203.582-054, as follows:

> Operates keyboard or other data entry device to enter data into computer or onto magnetic tape or disk for subsequent entry: Enters alphabetic, numeric, or symbolic data from source documents into computer, using data entry device, such as keyboard or optical scanner, and following format displayed on screen. Compares data entered with source documents, or re-enters data in verification format on screen to detect errors. Deletes incorrectly entered data, and re-enters correct data. May compile, sort, and verify accuracy of data to be entered. May keep record of work completed.[5]

Plaintiff's testimony about her job duties tracks the DOT classification for data entry clerk. She testified that, as she actually performed her job, she primarily did data entry and sat at her desk. Her coworker or supervisor typically handled incoming calls and lifting heavy objects—albeit because they were aware of her physical and mental impairments. At the hearing, the VE also determined that Plaintiff's actual exertion level appeared sedentary at most. A.R. 62. By contrast, the DOT classification for administrative assistant covers a much broader range of

---

[4] U.S. DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES (4th ed. rev. 1994), https://www.dol.gov/agencies/oalj/topics/libraries/LIBDOT.

[5] *Id.*

1    skills than Plaintiff deployed in her work for Catholic Charities.   The DOT definition embraces
2    many other tasks that Plaintiff did not perform, other than "[m]ay compile, store, and retrieve
3    management data."   *See* U.S. DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES, *supra*, at
4    169.167.010.  While she "occasionally" answered phone calls and answered the door, no record
5    evidence shows that these tasks fundamentally changed the nature of her work.  *See Stacy*, 825
6    F.3d at 570.  Cross-examination of the VE by Plaintiff's counsel did not elicit any testimony to
7    suggest that data entry was not the appropriate classification.  *See* A.R. 65-67 ("Q: . . . what are
8    the requirements of that job, the data entry clerk, because I imagine it's not like an assembly line,"
9    and "what I'm thinking of is if it's the kind of work where information is keyed into the computer
10   typically at the same time that the information is received in the office").  Therefore, the ALJ did
11   not err in accepting the VE's determination that Plaintiff's past relevant work is properly classified
12   as a data entry clerk.  *See* A.R. 23.

13        The court notes that, according to Plaintiff's testimony, her coworker and supervisor
14   "would help out" and "take over" certain tasks she may otherwise have been responsible for
15   because "they saw that [she couldn't] deal with it."  A.R. 47-48.  Such tasks including lifting
16   supplies, letting visitors onto the premises, and responding to callers.  Substantial evidence
17   indicates that, even if Plaintiff had to perform these tasks without her colleagues' help, these tasks
18   were not so substantial as to fundamentally change the nature of her work.  Nonetheless, on
19   remand, given Plaintiff's testimony that she could not perform certain job duties without the
20   assistance of her coworkers, the ALJ should conduct further factfinding regarding how Plaintiff's
21   severe impairments impact her ability to perform her past relevant work of data entry clerk.

### 4.     Failure To Consider Mental Impairments

23        Plaintiff argues that the ALJ erred by not considering her mental impairments in his
24   analysis of her past relevant work.  In light of the court's conclusion that the ALJ erred at step two
25   in determining that Plaintiff's mental impairments are nonsevere, the court declines to rule on this
26   issue at this time as it may be affected by the ALJ's decision on remand.  On remand, the ALJ
27   shall revisit the step four analysis and provide specific factual findings as to the effect of
28   Plaintiff's mental impairments on her residual functional capacity and the physical and mental

demands of her work.  *See Pinto*, 249 F.3d at 844-45.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted in part and denied in part.  Defendant's cross-motion for summary judgment is also granted in part and denied in part.  This case is remanded for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated: September 30, 2021



_____
Donna M. Ryu
United States Magistrate Judge

17